W.H., Appellant,

v.

D.W., et al., Appellees.

No. 11–FM–1334.

District of Columbia Court of Appeals.

Argued Nov. 15, 2012.

Decided Oct. 24, 2013.

Michael A. Troy, for appellant.

Anna Myles–Primakoff, with whom Melissa Colangelo was on the brief, for appellees.

Before BLACKBURNE–RIGSBY and EASTERLY, Associate Judges, and REID, Senior Judge.

REID, Senior Judge:

This case involves a justiciability question, that is, whether appellees, D.W. and J.W., have standing under a District of Columbia statute that authorizes custody by persons other than a natural or biological parent. The case also raises an issue concerning the presumption that a natural or biological parent, here appellant W.H. III ("W.H."), has the right to custody of his children.

W.H. appeals from the order of the Family Court granting joint legal and physical custody of his biological children, T.H. and W.H. IV, to their brother, D.W.[1] and their maternal grandmother, J.W.; the order provided for supervised visitation by W.H. The Family Court issued its order after D.W. and J.W. applied for custody of T.H. and W.H. IV under the District of Columbia Safe and Stable Homes for Children and Youth Act of 2007 ("the Act"), D.C.Code §§ 16–831.01, *et seq.* (2012 Repl.). As we discuss below, among other provisions, the Act creates a legal right on the part of a third party, defined as someone who has lived with a child for a specified period of time and who also has "primarily assumed the duties and obligations for which a parent is legally responsible"; the third party has a legal, statutory right to seek legal and physical custody of the child, that is, legal responsibility for the child, thereby "promot[ing] a safe and stable home for [the] child." *See* D.C.Code § 16–831.02(B)(i) and (ii); *see also* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY, REPORT ON BILL 17–41, "SAFE AND STABLE HOMES FOR CHILDREN AND YOUTH AMENDMENT ACT OF 2007," 1 (Comm. Print 2007). The Act also includes a rebuttable parental presumption, specifies the factors for refutation of that presumption by clear and convincing

---

1. D.W. is not the biological child of W.H.; D.W.'s father was G.B. W.H. states that D.W. is the "step-brother" of T.H. and W.H. IV. D.W. is the children's half-brother because D.W., T.H. and W.H. IV have the same biological mother, C.W. Although D.W. technically is the children's half-brother, we refer to him in this opinion as T.H.'s and W.H. IV's "brother."

evidence, and calls for custody to be awarded based upon the best interests of a child. D.C.Code §§ 16–831.05, 16–831.07.

W.H. challenges the judgment of the Family Court, arguing that the Family Court "erred in finding that the plaintiffs individually and/or jointly had standing, and erred in awarding custody to them," because (1) as the biological father of the children, he "has a preferred status under the Act"; (2) third party custody "standing has not yet been found to be a constitutional undertaking by the District of Columbia"; and (3) D.W. and J.W. "lack standing to bring their claim against [W.H.], the children's biological father." We conclude that (1) the Family Court correctly determined that D.W. has standing to bring a complaint for custody under the Act; (2) although J.W. does not have standing under the Act, the Family Court did not err by awarding custody of T.H. and W.H. IV jointly to D.W. and J.W. based on the best interests of the children; and (3) the Family Court properly found that D.W. and J.W. rebutted the statutory parental presumption by clear and convincing evidence. Consequently, we affirm the judgment of the Family Court.

## FACTUAL SUMMARY

The record reveals that T.H. and W.H. IV, born in 1998 and 1999 respectively, are the biological children of W.H. and C.W. W.H. and C.W. resided together for only about one month. The children lived with their mother and D.W., who was born in 1991. Because C.W. experienced serious health problems, her mother, J.W., as well as D.W., provided increasing care for and nurture of T.H. and W.H. IV. C.W. died of an epileptic seizure in August 2010.

A few days after C.W.'s death, D.W. filed a complaint for custody of the children, indicating that he was the caretaker of T.H. and W.H. IV. He sought sole legal and physical custody of the children. He requested child support from W.H. D.W. and J.W. lodged an amended complaint for custody of the children on September 7, 2010. They requested joint legal and physical custody, and child support from W.H. The Honorable John Bayly issued an order, *pendente lite*, on the same day, requiring the children "to remain in the physical custody of [D.W. and J.W.]," with supervised visitation by W.H. The judge also placed the children in the "shared" legal custody of D.W., J.W., and W.H. In addition, Judge Bayly issued an order, on September 10, 2010, for home studies relating to the children.

On February 7, 2011, W.H. sought to dismiss the amended complaint on the ground that D.W. and J.W. did not have standing under the Act. Specifically, W.H. asserted that in accordance with D.C.Code § 16–831.02(b)(1), "[a] parent may move to dismiss a third party's claim at any time on the grounds that the third party does not meet the statutory requirements for standing under the Act," including D.C.Code § 16–831.02(a)(1).[2] In his oppo-

---

2. D.C.Code § 16–831.02(a)(1) states:

(a)(1) A third party may file a complaint for custody of a child or a motion to intervene in any existing action involving custody of the child under any of the following circumstances:

(A) The parent who is or has been the primary caretaker of the child within the past 3 years consents to the complaint or motion for custody by the third party;

(B) The third party has:
(i) Lived in the same household as the child for at least 4 of the 6 months immediately preceding the filing of the complaint or motion for custody, or, if the child is under the age of 6 months, for at least half of the child's life; and
(ii) Primarily assumed the duties and obligations for which a parent is legally responsible, including providing the child

sition to W.H.'s motion to dismiss, D.W. argued that (1) he had standing under the Act as T.H.'s and W.H. IV's "de facto parent,"[3] (2) he also had standing to file for custody of the children as a third-party under D.C.Code § 16–831.02(a)(1)(B)(i) and (ii), and (3) clear and convincing evidence refuted the statutory parental presumption.

Judge Bayly held a hearing on the motion to dismiss, on May 4, 2011.[4] He determined that D.W. had standing within the meaning of §§ 16–831.02(a)(1)(B)(i) and (ii), and that W.H. had not assumed his parental responsibilities "at all." Therefore, he decided that D.W. could "proceed as Plaintiff in this case." He did not reach a definitive conclusion as to J.W.'s standing, but he "proceed[ed] as though [J.W.] [were] here as Plaintiff,"

while he continued to think about "the unusual factual situation." After the hearing, Judge Bayly issued an order on May 4, 2011, declaring that: "Upon consideration of" D.W.'s "Opposition ... and all evidence herein, ... Defendant's Motion to Dismiss for Lack of Standing is DENIED."

The case was transferred to the Honorable Hiram Puig–Lugo sometime in August 2011. On August 29, 2011, W.H. filed a "Contested Answer to Complaint for Custody and/or Access to Children and Counterclaim for Custody and/or Access to Children." The trial court conducted an evidentiary hearing on the same day. D.W., J.W. and Ms. Bradford testified on behalf of Plaintiffs D.W. and J.W.; and W.H. and his fiancée testified on his behalf.

---

with food, clothing, shelter, education, financial support, and other care to meet the child's needs; or

(C) The third party is living with the child and some exceptional circumstance exists such that relief under this chapter is necessary to prevent harm to the child; provided, that the complaint or motion shall specify in detail why the relief is necessary to prevent harm to the child.

3. (1) "De facto parent" means an individual:
 (A) Who:
 (i) Lived with the child in the same household at the time of the child's birth or adoption by the child's parent;
 (ii) Has taken on full and permanent responsibilities as the child's parent; and
 (iii) Has held himself or herself out as the child's parent with the agreement of the child's parent or, if there are 2 parents, both parents; or
 (B) Who:
 (i) Has lived with the child in the same household for at least 10 of the 12 months immediately preceding the filing of the complaint or motion for custody;
 (ii) Has formed a strong emotional bond with the child with the encouragement and intent of the child's parent that a parent-child relationship form between the child and the third party;

(iii) Has taken on full and permanent responsibilities as the child's parent; and
(iv) Has held himself or herself out as the child's parent with the agreement of the child's parent, or if there are 2 parents, both parents.

D.C.Code § 16–831.01(1).

4. D.W. and W.H. were represented by counsel, but J.W. appeared without counsel. After summarizing D.W.'s role in caring for the children, as outlined in the court-ordered home studies which were conducted by Joyce Bradford, Probation Officer in the Superior Court's Social Services division, the judge quoted a passage from the report concluding that "both [D.W. and J.W.] have a long history of making provisions and sacrifices for [T.H. and W.H. IV]." D.W. stopped going to school in the twelfth grade in order to help care for T.H. and W.H. IV. He later obtained a high school equivalency diploma (GED). Judge Bayly contrasted that finding from the home studies with the conclusion Ms. Bradford reached as to W.H.: W.H. assumed "a rather apathetic and irresponsible position," as manifested by "his failure to report for supervised visitation, inconsistent child support payments, [and] unresponsiveness during the home study process." The judge noted that the record estimated the amount owed by W.H. in child support at $14,000.

D.W.'s testimony revealed the following information. He was twenty years old at the time he testified, he worked about 24–27 hours a week, and he was the primary care giver for T.H. and W.H. IV. He has lived with them since their respective births, which is thirteen years in the case of T.H. Prior to her death, C.W. was "severely ill," and experienced "really bad seizures." As a result, "[s]he was normally in the bed for two weeks, three weeks at a time out of the month." D.W. cooks and cleans, attends school meetings, has conferences with the children's teachers, and accompanies the children to many functions as their guardian. He also assists in paying the rent, does the shopping, buys the children's clothes, and does the laundry. Because both children have asthma, and W.H. IV also suffers from attention deficit and hyperactivity disorder, and because the children still are grieving over the loss of their mother, D.W. ensures that they get to appointments with doctors and therapists, and that they take their required medication. His grandmother helps with the care of the children.

During C.W.'s life, W.H. lived with T.H. for only "three weeks to a month," never lived with W.H. IV, and visited with his children only "two to three times out of the year." When W.H. IV and T.H. were around nine and ten years old, respectively, W.H. did not see them for a two-year period. After C.W.'s death, the children stayed with him for about three weeks in the summer of 2010, but W.H. usually did not keep his visitation appointments, and he failed to celebrate their birthdays. During the then current year, 2011, W.H. had sent only three checks in support of the children. The children "fear" the prospect of living with their father; they informed D.W. that they are "afraid that [W.H.] may leave them over at his friend's house most of the time and not pay much attention to them." D.W. stated that he "would rather [the children] see [W.H.]," and that "they would love to see him more often, but they would rather stay with [D.W.]"

J.W., a full-time government employee, testified about her frequent contact with T.H. and W.H. IV (seven days a week), but indicated that C.W. and D.W. were "primary caregivers" for the children, and after C.W.'s death, D.W. remained their primary caregiver. J.W. lives about seven miles from D.W.'s residence; two adult sons reside with her. She confirmed the major caretaking tasks that D.W. performed (for example, cooking, shopping, doing the laundry), the contact of the children with their father only two to three times a year, and W.H.'s absence for a two-year period before C.W. died. J.W. described D.W.'s relationship with the children as "pretty good." She has watched their interaction especially on Fridays or Saturdays at their "family night" during which they play games or watch a movie. T.H. and W.H. IV have a "very close" relationship with J.W.'s adult daughter and her three children. However, when W.H. "comes around," W.H. IV "doesn't say a lot," and T.H. "always argue[s] with him, asking him where he's been and why it took so long to contact them." The children would rather stay with D.W. T.H. has stated that when W.H. takes them for a visit, he tends to "drop[ ] them off with somebody, or leav[e] them in the car for a couple of hours at a time."

Ms. Bradford, discussed her home study investigation and report. She was able to complete the study of the homes of D.W. and J.W., but never received a response from W.H. to her contact letter or voice mail messages. She observed the interactions of D.W., T.H. and W.H. IV in their home, and the children took Ms. Bradford on a tour of their home. Each child had a separate bedroom and there was sufficient

food and clothing in the home. She concluded that the children "were very respectful and comfortable at home"; they were in "a safe environment"; and "they treat [D.W.] as a parental figure." Ms. Bradford recommended that the children remain in the joint custody of D.W. and J.W. Judge Puig–Lugo admitted the home study report and recommendation into evidence.

W.H. resides in Fredericksburg, Virginia with his fiancée and her five children; when he testified, he had lived in Virginia for two years. His fiancée was pregnant with his child. W.H. is employed as a bus driver for a private company. He claimed that he had an arrangement with C.W. from 2002 to her death. "[He] got the kids every weekend and every summer, all summer long." After C.W.'s demise, he "kept the children for three or four days," then he had to go to work for a day, but told the children that he would "be by [the next day]." The children asked to spend the night at their grandmother's house. However, when he went back, he received "the subpoena to come to court for custody." He became "upset" and "had [a] big argument," apparently with J.W. and D.W.[5]

W.H. acknowledged that he had not had contact with his children since the Family Court awarded temporary custody to D.W. and J.W. He claimed that when he would call J.W., either "they hung up the phone or they're not at home." Therefore, he "just stopped calling." W.H. explained that he had been out of work for a year due to a spinal and neck injury, and he had returned to his job in late September 2010. In addition, his fiancée had a medical prob-

lem, and then she was injured in a bus accident. She gave birth to a child who only lived one week.

W.H. admitted that at the time of C.W.'s death, he owed $13,000 in child support, but claimed that he could not pay because he had been out of work. In response to questions from Judge Puig–Lugo, W.H. said he had seen his children only "twice" since the court entered the temporary custody order, and that the last time he saw his children was "maybe middle of September" 2010. He insisted that he had called the Family Court's Supervised Visitation Center but he "never got in contact with [anyone]." But, he also asserted that he "spoke with one person," and "she didn't know exactly who was on the case but they would contact both parties."

W.H.'s fiancée testified that she "consider[ed] [T.H. and W.H. IV]" like "[her] kids," and "[l]ike a best friend." She described the personal problems she had in late September and early October 2010; her uncle was terminally ill and she suffered problems with her pregnancy. She characterized W.H. as "a fit and proper person to have custody of his two children." She had not seen the children "[s]ince their mother passed," and she could not recall the exact date on which she last saw them. She would "see [the children] on weekends or ... if they're out of school, they'll come over, in the summertime." In response to Judge Puig–Lugo's question about the "kind of things ... the children [did] when they were with [her] during the summers," the fiancée answered: "We did like a lot of outside activities. We take them out [to] movies."

---

5. When asked what he did "to stay involved when the children were born, W.H. replied, "I worked—I picked up a second job" because "children can be expensive." C.W. used his insurance card when she had to take the children to the hospital. When C.W. had

something else to do, he would take the children to the hospital. He estimated that he had taken the children to medical appointments about "ten, twelve" times. W.H. discussed his dissatisfaction with T.H.'s school, saying that she "fought all year round."

She added: "Anytime we can't get out, we do like family time inside."

Judge Puig–Lugo made extensive oral findings based on the testimony and documentary evidence, and he drew conclusions about the interpretation of the applicable statutory provisions, including the rebuttable parental presumption,[6] and third party custody. He credited testimony given by D.W. and J.W. The judge specifically discredited W.H.'s testimony concerning his efforts to be involved in the children's lives, and generally discredited that of W.H.'s fiancée.

Judge Puig–Lugo also issued written findings and conclusions of law on September 21, 2011. He reiterated much of the trial testimony given by D.W. and J.W. regarding their caretaker relationship with the children, commented on the failure of W.H. to keep his supervised visitation appointments with the children, and found that: "[b]oth children wish to continue living with their brother, [D.W.], and frequently staying with their grandmother, [J.W.]." He concluded that D.W. "has standing to file a third party complaint pursuant to D.C.Code § 16–831.02(a)(1)(B)," and that J.W. "has standing to file for third party custody because pursuant to D.C.Code § 16–831.04(a)(5),[7] an order may include any custody arrangement that the [c]ourt determines is in the best interests of the child." He further found that there is clear and convincing evidence to rebut the parental presumption under D.C.Code § 16–831.07,[8] because of W.H.'s lack of involvement with the

---

6. D.C.Code § 16–831.05 contains the parental presumption and provides:

 (a) Except when a parent consents to the relief sought by the third party, there is a rebuttable presumption in all proceedings under this chapter that custody with the parent is in the child's best interests.

 (b) If the court grants custody of the child to a third party over parental objection, the court order shall include written findings of fact supporting the rebuttal of the parental presumption.

7. D.C.Code § 16–831.04 specifies that:

 (a) A custody order entered under this chapter may include any of the following:
 (1) Sole legal custody to the third party;
 (2) Sole physical custody to the third party;
 (3) Joint legal custody between the third party and a parent;
 (4) Joint physical custody between the third party and a parent; or
 (5) Any other custody arrangement the court determines is in the best interests of the child.

 (b) An order granting relief under this chapter shall be in writing and shall recite the findings upon which the order is based.

8. D.C.Code § 16–831.07 states:

 (a) To determine that the presumption favoring parental custody has been rebutted, the court must find, by clear and convincing evidence, one or more of the following factors:
 (1) That the parents have abandoned the child or are unwilling or unable to care for the child;
 (2) That custody with a parent is or would be detrimental to the physical or emotional well-being of the child; or
 (3) That exceptional circumstances, detailed in writing by the court, support rebuttal of the presumption favoring parental custody.

 (b) The court shall not consider a parent's lack of financial means in determining whether the presumption favoring parental custody has been rebutted.

 (c) The court shall not use the fact that a parent has been the victim of an intrafamily offense against the parent in determining whether the presumption favoring parental custody has been rebutted.

 (d) If the court concludes that the parental presumption has not been rebutted by clear and convincing evidence, the court shall dismiss the third party complaint and enter any appropriate judgment in favor of the parent. The court shall only address the factors set forth in § 16–831.08 once the presumption favoring parental custody has been rebutted.

children, his failure to (1) visit with them, (2) respond to and participate in the home study process, (3) make child support payments, and (4) "participate [in] the children's lives overall"; these failures "amount[ ] to abandonment." Judge Puig–Lugo also declared that "exceptional circumstances support rebuttal of the presumption favoring parental custody because the children have lived their entire lives in the same home with the constant support and presence of [D.W.], who has helped raise them," and because "the children see [D.W.] as a parental figure." Finally, Judge Puig–Lugo considered and applied the factors, set forth in D.C.Code § 16–831.08, that determine the best interests of the child.[9]

W.H. noticed a timely appeal.

## ANALYSIS

W.H. first argues that the trial court erred because it failed to recognize that as the biological father of T.H. and W.H. IV, he "has a preferred status under the Act." Second, he contends that standing for third parties to sue for custody "has not yet been found to be a constitutional undertaking by the District of Columbia," and that the Supreme Court of the United States has not "embraced" the kind of standing reflected in the Act. Third, he

maintains that neither D.W. nor J.W. has standing under the Act.

D.W. and J.W. assert that W.H. has challenged neither the trial court's factual findings relating to the statutory parental presumption, nor the award of shared joint and legal custody of the children to D.W. and J.W. on the ground of "the children's best interests under [D.C.Code] § 16–831.04." They argue that D.W. has standing under D.C.Code § 16–831.02(a)(1)(B) (relating to standing based on third party custody), and § 16–831.02(a)(1)(C) (pertaining to standing based on "exceptional circumstances"). They contend that the trial court properly determined that placement of the children under the shared physical and legal custody of D.W. and J.W. was consistent with the best interests of the children. Furthermore, they believe that if J.W. does not qualify for custody of the children under the Act, then sole physical and legal custody of the children should be given to D.W.

### Standard of Review and Applicable Legal Principles

 "Whether appellants have standing is a question of law reviewed *de novo;* however, underlying factual determinations are reviewed under the clearly erroneous standard." *Gaetan v. Weber,* 729 A.2d 895, 897 (D.C.1999) (citation omitted); *see also Daley v. Alpha Kappa Alpha So-*

---

9. D.C.Code § 16–831.08 states:
 (a) In determining whether custody with a third party, pursuant to this chapter, is in the child's best interests, the court shall consider all relevant factors, including:
 (1) The child's need for continuity of care and caretakers, and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
 (2) The physical, mental, and emotional health of all individuals involved to the degree that each affects the welfare of the child, the decisive consideration being

the physical, mental, and emotional needs of the child;
 (3) The quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives, and caretakers, including the third party complainant or movant; and
 (4) To the extent feasible, the child's opinion of his or her own best interests in the matter.
 (b) There shall be a rebuttable presumption that granting custody to a third party who has committed an intra-family offense is not in the best interest of the child.

*rority, Inc.,* 26 A.3d 723, 729 (D.C.2011). " 'Standing is a threshold jurisdictional question which must be addressed prior to and independent[ly] of the merits of any party's claim.' " *Grayson v. AT & T Corp.,* 15 A.3d 219, 229 (D.C.2011) (en banc) (quoting *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 974 (11th Cir.2005)) (citations omitted).

■■■ Even though we are an Article I court under the Constitution, "our cases consistently have followed the constitutional minimum of standing" required by Article III. *Grayson, supra,* 15 A.3d at 235. " 'In essence[,] the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues .... [so far as Article III is concerned, *that is,*] whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of ... jurisdiction and to justify exercise of the court's remedial powers on his behalf.' " *Id.* at n. 19 (quoting *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Article III "confines the judicial power of federal courts to deciding actual cases or controversies." *Hollingsworth v. Perry,* —— U.S. ——, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013). Furthermore, "[Article] III judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Grayson, supra,* 15 A.3d at 235 (quoting *Warth, supra,* 422 U.S. at 498, 95 S.Ct. 2197). Article III requires "actual or threatened injury," and such injury "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id.* at 224–25 (citing *Warth, supra,* 422 U.S. at 500–01, 95 S.Ct. 2197) (internal quotation marks and citations omitted). "One manifestation of injury in fact is the violation of legal rights created by statute." *Id.* at 234. Thus, an "injury in fact"

may be shown, in part, by "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 2685, 186 L.Ed.2d 808 (2013) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (internal quotation marks omitted). In that regard, a plaintiff must show "a judicially cognizable interest of [his or her] own," and "a generalized grievance" is insufficient as a basis for standing. *Hollingsworth, supra,* 133 S.Ct. at 2662, 2663.

■■■ Statutory interpretation principles are applicable to this case because we must interpret District of Columbia statutory provisions pertaining to third party custody and the rebuttable parental presumption. "[I]nterpreting a statute or a regulation is a holistic endeavor." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 528, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotation marks and citation omitted); *see also Tippett v. Daly,* 10 A.3d 1123, 1127 (D.C.2010) (en banc). "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C. 1983) (en banc) (internal quotation marks omitted). We interpret the words used by the legislature "according to their ordinary sense and with the meaning commonly attributed to them." *Id.* at 753 (internal quotation marks and brackets omitted). "[W]e do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them." *District of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 652 (D.C.2005) (en banc). "In appropriate cases, we also consult the legislative history of a statute." *Abadie v. District of*

*Columbia Contract Appeals Bd.*, 843 A.2d 738, 742 (D.C.2004) (citation omitted).

▆▆▆▆ In addition to applying the canons of statutory interpretation, this case requires us to examine legal principles governing certain fundamental parental rights and the limits on the exercise of those rights, because a statutory presumption may have "constitutional underpinnings." *See In re D.S.*, 60 A.3d 1225, 1228 (D.C.2013) (citation omitted) (*In re D.S. II*). Parents have a "fundamental right . . . to make decisions concerning the care, custody and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (citations omitted). "The 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'" *Id.* at 65, 120 S.Ct. 2054. "So long as a parent adequately cares for his or her children . . ., there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69, 120 S.Ct. 2054 (citation omitted). Natural parents do not lose their constitutionally-protected right to care for, have custody of, and manage their children "simply because they have not been model parents or have lost temporary custody of their children to the State." *In re C.M.*, 916 A.2d 169, 179 (D.C.2007) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)) (internal quotation marks omitted). Nevertheless, the constitutionally-protected right "is not absolute and must yield to the child's best interest and well-being, which is the overriding concern." *Id.* (internal quotation marks and citation omitted). But, "the right to presumptive custody of a fit, unwed, non-custodial father who has grasped the opportunity to be involved in his child's life can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with someone else." *In re D.S.*, 52 A.3d 887, 888 (D.C.2012) (*In re D.S. I*), *as clarified in part by In re D.S. I, supra,* on petition for rehearing.

### The Standing Issues

Because standing is a threshold issue that must be decided prior to considering the merits of a case, *see Grayson, supra,* 15 A.3d at 229, we first address the standing issues raised by W.H. As we understand it, part of W.H.'s contention is that the Supreme Court has never "embrace[d]," or "directly spoken on" the kind of "broad third-party standing" embodied in the Act, nor has "[s]uch standing . . . been found to be a constitutional undertaking by the District of Columbia."[10] By mixing or ignoring different statutory provisions and words of the Act that confer

---

10. We are not persuaded by W.H.'s argument that the Supreme Court has not "embraced" the kind of standing reflected in the Act, and that that type of standing reflected in the Act "has not yet been found to be a constitutional undertaking by the District of Columbia." First, as early as the decade of the 1970s, *Warth, supra,* at 422 U.S. at 500–01, 95 S.Ct. 2197, recognized that statutes creating legal rights may serve as a basis for constitutional standing. More recently, when the United States decided to change its position in a case after the decision of the federal appeals court, the Supreme Court concluded that an entity that intervened in the case had standing to argue the original position of the federal government, and that an *amicus* appointed by the Supreme Court to argue that the Court did not have jurisdiction provided the necessary adversarial posture of the case to satisfy Article III. *See Windsor, supra,* 133 S.Ct. at 2683–88. Second, this court has found standing where a plaintiff has asserted the deprivation of a statutory right. *See Grayson, supra,* 15 A.3d at 249; *Floyd v. Bank of Am. Corp.*, 70 A.3d 246, 251 (D.C.2013).

standing on third parties on different grounds,[11] W.H. loosely and insufficiently describes the Act as "establish[ing] a framework for finding standing to file a custody action to [*sic*] third parties with whom a minor child has established a strong emotional tie and who has assumed parental responsibilities for that minor child." Basically, he mixes part of the definition of a *de facto* parent with part of the third party custody provision. In the second part of his standing argument, W.H. claims that neither D.W. nor J.W. has standing under the Act.

We conclude that the Family Court did not run afoul of constitutional standing requirements, as those requirements have been interpreted and applied not only by the Supreme Court, but also by this court. In addition, we hold that D.W. has standing under D.C.Code § 16–831.02(a)(1)(B)(i) and (ii) of the Act. However, we further hold that J.W. does not have standing under either the *de facto* parent or the third party provisions of the Act, but that the Family Court did not err in permitting her to remain in the case as an interested party plaintiff; nor did the Family Court err by including her in the award of joint legal and physical custody of the children, consistent with D.C.Code § 16–831.04(a)(5), and § 16–831.13 (which preserves the Family Court's common law and equitable jurisdiction).

As this court extensively discussed in *Grayson, supra,* the Supreme Court has articulated principles governing both constitutional standing under Article III, and prudential or judicially adopted principles of standing. We have followed those principles in our cases. *Grayson* also makes clear that provisions enacted by the Council of the District of Columbia may provide a basis for satisfying the constitutional standing requirement of " 'an injury-in-fact ..., even though the plaintiff would have suffered no judicially cognizable injury in the absence of the statute.' " *Floyd, supra,* 70 A.3d at 251 (quoting *Grayson, supra,* 15 A.3d at 249).

 Here, the Act creates a legal right of a *de facto* parent, or a third party who meets statutory requirements, to take over the duties and responsibilities normally assumed by a natural or biological parent. However, to have standing in a court of law, the *de facto* parent or the third party must satisfy the statutory requirements and must show the existence of a case or controversy within the meaning of Article III.

 D.W. satisfies the requirements of D.C.Code § 16–831.02(a)(1)(B)(i) and (ii).[12] In order for a third party to "file a complaint for custody of a child," D.W. must have "lived in the same household as the child for at least 4 of the 6 months immediately preceding the filing of the complaint ... for custody." The ordinary meaning of "to live in" is "to reside," and "to reside" means "to live in a place for a permanent or extended time." WEBSTER'S II NEW COLLEGE DICTIONARY 656, 965 (3d ed. 2005). Because D.W. has resided continually in the same house as T.H. and W.H. IV since their respective births in 1998 and 1999, he lived with the children "at least 4 of the 6 months immediately preceding the filing of [his] complaint ... for custody," as the Family Court found. Under the statutory

---

11. Under the Act, two categories of people may establish standing: *de facto* parents, and third parties who can demonstrate that they meet the requirements set forth in D.C.Code §§ 16–831.02(a)(1)(A), (B), or (C).

12. Given our conclusion that D.W. has standing to bring a third party complaint under § 16–831.02(a)(1)(B)(i) and (ii), we do not decide whether he also has standing under other provisions of the Act.

provision, D.W. must also have "primarily assumed the duties and obligations for which a parent is legally responsible." D.C.Code § 16–831.02(a)(1)(B)(i) "Primarily" means "principally" or "chiefly." WEBSTER'S, *supra* at 698. "Assume" means to "take on." *Id.* at 70. Based on testimony at the evidentiary hearing, the factual findings and credibility determinations of the Family Court, there is no doubt that D.W. mainly took on the duties and obligations for which a natural or biological parent is responsible; during C.W.'s illness, she was unable to assume those duties and obligations. D.W. dropped out of school in the 12th grade to assume them, and he continued to perform those duties after C.W. died, as the Family Court found.

■ The remaining question is whether in the context of this case, D.W. satisfied constitutional standing requirements to bring his third party complaint for custody of the children. When W.H., the surviving natural or biological parent of the children (whose involvement with his children was minimal or non-existent through the years), filed his motion to dismiss and his counterclaim for custody, D.W. was threatened with deprivation of his statutory right to assume the duties and obligations for which a parent is legally responsible. And, the deprivation or invasion of D.W.'s legally protected interest was "concrete and particularized, ... imminent, not conjectural or hypothetical." *Windsor, supra,* 133 S.Ct. at 2685. (quoting *Lujan, supra,* 504 U.S. at 560–61, 112 S.Ct. 2130). As such, D.W. had such " 'a personal stake in the outcome of the controversy' " (regarding who should have custody of the children) " 'as to warrant his invocation of' the court's jurisdiction." *Grayson, supra,* 15 A.3d at 234 (quoting *Warth, supra,* 422 U.S. at 498–99, 95 S.Ct. 2197). W.H.'s opposition to D.W.'s complaint also provided the actual controversy and adversarial posture required under Article III, *Hollingsworth, supra,* 133 S.Ct. at 2661, and under prudential standing requirements, *Windsor, supra,* 133 S.Ct. at 2685, 2687, and 2688.

■ While we hold that D.W. had standing as a third party within the meaning of D.C.Code § 16–831.02(a)(1)(B)(i) and (ii), we conclude that J.W. does not satisfy the requirements of a *de facto* parent under § 16–831.01(1) and § 16–831.03(a) because she did not "live[ ] with [T.H. and W.H. IV] in the same household at the time of the [children's] birth," D.C.Code § 16–831.01(1)(A)(i), and did not "live[ ] with [them] in the same household for at least 10 of the 12 months immediately preceding the filing of the complaint ... for custody." D.C.Code § 16–831.01(1)(B)(i). Moreover, J.W. "has [not] held ... herself out as the [children's] parent with the agreement of the [children's] parent." D.C.Code § 16–831.01(1)(A)(iii), § (1)(B)(iv).

■ Nor does J.W. satisfy the statutory requirements for a third party who may bring a complaint for custody because she did not "live[ ] in the same household as the [children] for at least 4 of the 6 months immediately preceding the filing of the complaint ... for custody." D.C.Code § 16–831.02(a)(1)(B)(i). Nevertheless, because of her longstanding involvement in the care of the children, the frequency of her contact with the children, and the other factual findings of the Family Court revealing that she has played an important role in the lives of the children, we cannot say that including her in the award of joint legal and physical custody of the children constituted error, given the Family Court's statutory authority to enter "[a]ny other custody arrangement the court determines is in the best interests of the child." D.C.Code § 16–831.04(a)(5). Indeed, the Act clearly provides that: "Nothing in [the

chapter pertaining to third-party custody] shall be construed ... to preempt any authority of the court to hear and adjudicate custody claims under the court's common law or equitable jurisdiction." D.C.Code § 16–831.13.

### The Rebuttable Parental Presumption

■ W.H. contends that as the biological father of T.H. and W.H. IV, he "has a preferred status under the Act." Citing *Shelton v. Bradley*, 526 A.2d 579, 580 (D.C. 1987), W.H. emphasizes the "strong presumption that, upon the death of one parent, the surviving parent will have custody of any minor children." He asserts that "it is not enough for a court to find that a certain party will possibly be a better parent for a minor child; instead, extremely sufficient evidence must be found to take a child away from his or her rightful parent."

■ In considering W.H.'s arguments, we first note that neither the Act nor the Family Court's judgment terminates W.H.'s parental rights. He is still the natural, biological father of T.H. and W.H. IV. In fact, the Act specifically contains a "rebuttable presumption ... that custody with the parent is in the child's best interests." D.C.Code § 16–831.05(a). This presumption is consistent with the constitutionally recognized "fundamental right [of parents] to make decisions concerning the care, custody and control of their children." *Troxel, supra*, 530 U.S. at 66, 120

S.Ct. 2054. But, the parental presumption also accords with the principle that a parent's constitutionally-protected right "is not absolute and must yield to the child's best interest and well-being, which is the overriding concern." *In re C.M., supra*, 916 A.2d at 179 (citing *Santosky, supra*, 455 U.S. at 753, 102 S.Ct. 1388).

The Act further safeguards the constitutionally-protected parental right by specifying that "the court must find, by clear and convincing evidence, one or more of [three] factors": "(1) [t]hat the parents have abandoned the child or are unwilling or unable to care for the child, (2) [t]hat custody with a parent is or would be detrimental to the physical or emotional well-being of the child; or (3) [t]hat exceptional circumstances, detailed in writing by the court, support rebuttal of the presumption favoring parental custody." D.C.Code § 16–831.07(a)(1), (2), and (3).

The record here establishes that Judge Puig–Lugo made detailed written findings, by clear and convincing evidence, showing that (1) W.H. was "unwilling ... to care for [his] children,"[13] as indicated by his lack of involvement in their lives for significant periods of time, (2) W.H.'s custody of the children "would be detrimental to the ... emotional well-being of the child[ren]," because they wanted to continue living with D.W. because they "fear[ed]" the possibility of living with their father, and because they were "afraid that [he] may

---

13. Judge Puig–Lugo concluded that W.H. had "abandoned" his children. We rest our conclusion on the alternative statutory language, "unwilling ... to care for the child." At this point we are not prepared to say that W.H. has "abandoned" his children. The Act does not define abandonment in the context of a third-party custody complaint where there is no allegation of neglect and no effort to terminate parental rights. We have used an objective test for abandonment under the neglect statute: the parent "has made no reasonable effort to maintain a parental relationship with the child for a period of at least four (4) months." D.C.Code § 16–2316(d)(1)(C); *see also In re Je.A.*, 793 A.2d 447, 449 (D.C.2002). In the adoption/termination of parental rights context, to determine abandonment we ask whether, in the totality of the circumstances, " 'the parent's conduct manifests an intention to be rid of all parental obligations[,] and to forego all parental rights.' " *In re Petition of J.T.B.*, 968 A.2d 106, 118–19 (citing *In re C.E.H.*, 391 A.2d 1370, 1373 (D.C.1978)).

342

leave them over at his friend's house most of the time and not pay much attention to them"; and (3) "exceptional circumstances ... support rebuttal of the presumption favoring parental custody." These "exceptional circumstances" include the Family Court's written findings that D.W. and the children actually want the children to have more frequent contact with W.H., but he has not "grasped the opportunity to be involved in the [children's] life," *In re D.S., supra*, 52 A.3d at 888, as evidenced by "his failure to report for supervised visitation," his "unresponsiveness during the home study process" conducted by the Family Court's Social Services division, the fact that he lived with T.H. for less than a month of her life and never resided in the same household with W.H. IV. Furthermore, W.H. did not see his children for a two-year period beginning when they were nine and ten years old, respectively. W.H. usually saw the children only two or three times a year, and by his own admission, the last time he saw his children was "maybe the middle of September 2010." In addition, the Family Court credited the testimony of Ms. Bradford that the children "treat [D.W.] as a parental figure." Significantly, W.H. does not contest the Family Court's factual findings relative to the rebuttable presumption. Nor does he contest the court's specific findings concerning the best interests of the children under D.C.Code § 16–831.08(a).

In sum, we are satisfied that D.W. had standing to bring his third party complaint for custody of T.H. and W.H. IV, that the Family Court did not err by concluding that D.W. and J.W. presented clear and convincing evidence refuting the parental presumption, and that the court did not err by awarding joint legal and physical custody of the children to D.W. and J.W. under D.C.Code §§ 16–831.02(a)(1)(B)(i) and (ii), in the case of D.W., and under § 16–831.04(a)(5) and § 16–831.13, in the case of J.W.

Accordingly, for the foregoing reasons, we affirm the judgment of the Family Court.

*So ordered.*