**Jennifer JOHNSON, Appellant,**

v.

**Keith A. WASHINGTON, Appellee.**

**No. 97–FM–1806.**

District of Columbia Court of Appeals.

Submitted June 22, 1999.

Decided July 27, 2000.

---

Ronnie London was on the brief for appellant.

Keith A. Washington, pro se.

Before FARRELL and RUIZ, Associate Judges, and BELSON, Senior Judge.

RUIZ, Associate Judge:

In this appeal, Jennifer Johnson seeks reversal of the trial court's award of primary residential custody of her daughter, K., to K.'s father, Keith Washington. Johnson asserts that the court improperly based its custodial decision solely on a desire to avoid further discontinuity in K.'s living environment by leaving her in Washington's physical custody, a situation which had been created when the trial court, because of docket congestion, continued the trial and failed to entertain Johnson's pre-trial motions for *pendente lite* support due to docket pressures. Although we determine that the trial court erred in

deferring consideration for *pendente lite* support, we affirm the trial court's grant of physical custody to Washington, concluding that the record supports the trial court's determination that primary residential custody with Washington was in the best interest of the child.

### I.

Appellee, Keith Washington, brought this action seeking sole physical and legal custody of the parties' minor daughter, K. Appellant, Jennifer Johnson, counter-claimed, also requesting sole physical and legal custody of K., in addition to permanent child support for K. pursuant to D.C.Code § 16–916(c) (1997).

K. was born on February 4, 1996, and initially lived with both parents, who have never been married to one another, in Washington's home, which he shared with his mother, his aunt, his maternal grandmother, and others. Johnson lived with K. and Washington until mid-December, 1996, when she was forced out because she and Washington's aunt did not get along. Although Johnson at first took K. with her when she moved out to live with her sister, she returned K. to Washington's custody three days later, on December 16, 1996, after realizing that her sister's one-bedroom apartment was too small to share among her sister, her sister's boyfriend, their baby, Johnson and K. Two months later, however, Johnson took K. back after she had saved enough money to afford her own apartment.[1]

On February 28, 1997, Washington filed a complaint for custody of K. Johnson filed an amended answer and counterclaim seeking custody of K. and child support from Washington on March 27, 1997.[2] While the matter was pending a trial date, Johnson filed a separate motion for *pendente lite* custody and support of K. on

---

1. During the two-month period between December 16, 1996, and February 15, 1997, while K. was in Washington's primary custody, K. would stay with Johnson on weekends.

2. Johnson initially filed an answer and counterclaim *pro se*, but subsequently obtained counsel who filed her amended answer and counterclaim.

April 11, 1997. In her motion, Johnson alleged that Washington had failed to provide support for K. as required by D.C.Code § 16–916(c), other than medical coverage for K. under his insurance policy.[3] On April 15, 1997, the trial court issued an order scheduling a hearing on the *pendente lite* motion for May 30, 1997. One week later, on April 22, 1997, the court set a trial date on the custody determination for July 10, 1997.

As a result of a congested docket, the trial court was unable to entertain Johnson's *pendente lite* motion on May 30, 1997, as scheduled; nor did it reschedule the hearing as there were no dates available before the July 10 trial date. Subsequently, however, on its own motion, the court continued the trial to October 6, 1997, again because of its overloaded docket. The postponement of the trial date, as well as difficulties obtaining necessary discovery materials from Washington, caused Johnson to file a combined motion in limine, or in the alternative, to compel discovery,[4] and emergency motion for *pendente lite* support on July 14, 1997. In her emergency motion for *pendente lite* support, Johnson explained her need for the requested relief:

> Ms. Johnson is faced with a Hobson's choice in this case. Ms. Johnson can go to trial in this case despite Mr. Washington's failure to provide the full and fair discovery necessary to her undersigned counsel being able to properly prepare

her case. Alternatively, she can seek to have the Court compel discovery and continue the instant action. However, given the Court's inability to hear her motion for support *pendente lite,* and due to the fact that Mr. Washington is currently providing no financial support for the needs of [K.], Ms. Johnson and [K.] would be subject to significant financial hardship between now and the time the case could be eventually recalled. The instant motion seeks to have the Court provide a remedy that would avoid Ms. Johnson having to make the untenable choice set forth above.

Attached to the motion was a calculation of the support which Washington was obligated to pay under the Child Support Guidelines, pursuant to D.C.Code § 16–916.1.[5] Given the information in the record, Johnson requested that the trial court "quickly and affirmatively rule on her urgent request for assistance with the expenses of providing for the needs of [K.]," and further stated: "The parties have disclosed, and the Court has before it, all the materials necessary to grant Ms. Johnson's request for support."

Despite Johnson's invitation to the court to decide the temporary support issue on the papers,[6] the trial court on July 22, 1997, struck through the portion of Johnson's proposed order pertaining to the support request, instead ordering the parties to submit to mediation on the support issue,[7] while granting Johnson's motion to

3. In his motion for visitation and his opposition to Johnson's counterclaim for custody, Washington denied that he had neglected to provide support for K., and further asserted that he had executed the lease for the apartment where Johnson and K. resided.

4. Johnson alleged that Washington had failed to provide satisfactory responses to her interrogatory requests, thereby prejudicing her ability to sufficiently prepare her case for trial. Accordingly, in her motion, Johnson requested that the court either prohibit certain members of Washington's household from testifying at the custody proceeding, or, in the alternative, issue an order compelling Washington to provide the requested information, and continue the trial.

5. According to Johnson's calculations, given her gross income of $15,000 from her employment with Riggs Bank, Washington's income of $32,335, his payment of medical insurance premiums on K.'s behalf of $3,840, and K.'s estimated annual child care costs of $3,840, Washington was obligated to pay yearly support of $6,314, or $526 per month.

6. *But see* D.C.Code § 16–916.1(a) (providing that the judicial officer "shall conduct a hearing on child support").

7. The record does not indicate whether any mediation was, in fact, undertaken. As neither party comments on the court's order regarding mediation, we do not address it.

compel discovery. In a handwritten addition to the order, the court wrote: "It should be noted that the court's calendar cannot accommodate a *pendente lite* hearing prior to the scheduled trial date."[8] In early September 1997, after being unable to stay afloat financially,[9] Johnson was forced to give up custody of K. and returned her to Washington's custody pending the trial.[10]

On October 6, 1997, after hearing testimony from both Johnson and Washington, as well as from Washington's mother and grandmother, the trial court determined that both Johnson and Washington were fit and proper parents and awarded them joint legal custody. The court then awarded primary physical custody to Washington, with visitation rights for Johnson every other weekend, during Christmas and spring breaks, and thirty days during the summer.[11] Johnson was further ordered to pay $50 a month in child support to Washington. In its written order detailing the custody arrangements, the court indicated that it had made its custody determination in the belief:

6. That both of the parties love the minor child and both are good parents who have the best interest of the minor in mind.

7. That it is in the best interest of the minor child that she have continuity in her environment.

8. That it is in the best interest of the minor that both parties have joint custody of the minor child.

9. That it is in the best interest of the minor child that [Washington] have primary residential custody.

On several occasions during the trial, and prior to announcing its ultimate decision, the court expressed concern that shuttling K. back and forth between both parents was affecting K.'s development and stressed the importance of "some kind [of] continuity in a little person's life." In addition, in response to Washington's allegation that Johnson had impermissibly conditioned his ability to visit K. on payment of child support for K., the judge first cautioned Johnson that the two rights were not related, but then stated that "if I

---

8. In her response to Washington's opposition to her motion in limine and emergency motion for temporary support, submitted after the court issued its July 22, 1997, order, Johnson reiterated that "the Court now possesses all of the information necessary to make an expedited determination regarding temporary support." No further action was taken by the court prior to trial.

9. Johnson testified at trial that without any financial support from Washington for K., she had been unable to continue to support both K., and K.'s half-sister, J., Johnson's daughter from a prior relationship for whom Johnson also did not receive any financial support, and in addition pay off her student loan and other bills.

10. Johnson also filed a separate action seeking child support from Washington, but failed to attend a hearing on the matter which was held on September 24, 1997, after the time Johnson claims she had already given up physical custody of K. because of Washington's failure to pay child support. Johnson testified that she did not appear at the hearing on September 24 because she "knew" Washington would not be present at the hearing, and that when she called the court, someone told her that Washington had not shown up. However, Washington stated that he went to court on two separate occasions to attend the support hearing, including on September 24, but Johnson failed to appear on either occasion. Washington also proffered to the court a buck slip, which is commonly used by judges to attach notes to case files, which he had signed to indicate his attendance on September 24.

11. The trial court indicated that the custody determination was subject to review, stating:

I'm gonna review this. For a time I'm going to allow Mr. Washington to have primary residence until you [Johnson] can get yourself a little more together. And, you're gonna have every other weekend, Christmas break, Spring break and 30 days in the Summer. And then, I'm gonna see you all in April or May, and I'm going to see where—where you are.

There is no indication in the record, nor do the parties address in their briefs, whether there was a subsequent hearing before the trial court and, if so, what the trial court determined at that time.

didn't award child support then I made an error. Because, there is no situation that I can think of if I'm doing what I'm suppose[d] to do where I don't award child support." Nonetheless, the court declined to rule on Johnson's oral request for back support for the period between her first motion for *pendente lite* support and September 1997 when she returned K. to Washington's custody, because Johnson had failed to file a written motion requesting such relief. Johnson now appeals the trial court's custody determination.

Johnson challenges the trial court's award of primary residential custody to Washington, contending that the trial court abused its discretion in making the custody determination because it based its decision solely on circumstances arising from its earlier failure to entertain her two motions for *pendente lite* support, which Washington had been obligated to pay under D.C.Code § 16–916. *See W.M. v. D.S.C.*, 591 A.2d 837, 842 (D.C.1991). Had the trial court ruled on her motions and ordered Washington to pay temporary child support pending the trial, Johnson asserts, she never would have had to give up custody of K. just prior to the hearing. Consequently, because the trial court awarded primary residential custody of K. to Washington solely for the purpose of maintaining stability in K.'s living environment, she was prejudiced by the trial court's earlier refusals to rule on her *pendente lite* motions for support. In essence, Johnson argues that by basing its custodial decision on a factor created by the court's own earlier error, the trial court abused its discretion, warranting vacation of the custodial award and reconsideration of the matter of primary physical custody with-

out reference to K.'s residence with Washington during the month prior to trial.

## II.

It is a matter of concern that the trial court's failure to entertain Johnson's two motions for *pendente lite* support prior to trial may have contributed to Johnson's inability to adequately provide for K., and her consequent decision to place K. in Washington's care just prior to trial, which in turn became a factor in the trial court's determination that it was in K.'s best interest to remain, without further disruption, in Washington's physical custody. While we generally defer to the trial court's exercise of discretion with respect to the management and scheduling of court matters, *see, e.g., Ferrell v. Rosenbaum*, 691 A.2d 641, 646 (D.C.1997), we note that there is "also a paramount judicial obligation to resist calendar pressures in specific cases in which yielding to them is likely to prejudice substantial rights." *Fehnel v. Fehnel*, 186 N.J.Super. 209, 452 A.2d 209, 212 (App.Div.1982). Although by its own terms, D.C.Code § 16–916(a), the statute allowing courts to award temporary support in custody proceedings, does not provide a time limit by which a trial court must decide a petitioner's motion, we conclude that consistent with the stated purpose of *pendente lite* relief under § 16–916(a), the trial court must consider motions for temporary support in a timely manner,[12] particularly after the petitioner makes it clear that his or her financial situation will become critical without support from the other parent.[13] Black's Law Dictionary defines *pendente lite* as "[p]ending the lawsuit; during the actual progress of a suit; during litiga-

---

**12.** In this case, for example, the first motion for *pendente lite* support was filed in April, 1997, nearly six months before the eventual trial date.

**13.** The need to act expeditiously in deciding *pendente lite* matters has been recognized by court rule or statute in other jurisdictions. In New York, courts are required to render decisions on *pendente lite* applications within thir-

ty days. *See* N.Y. COMP.CODES R. & REGS. tit. 22, § 202.16(g)(5); *Langone v. Langone*, 145 Misc.2d 340, 546 N.Y.S.2d 535, 537 (Sup.Ct. 1989). Courts in Kentucky are required to order payment of *pendente lite* child support pursuant to the applicable guidelines within fourteen days from the filing of the motion. *See* KY.REV.STAT. ANN. § 403.160 (1999).

tion." BLACK'S LAW DICTIONARY 1134 (6th ed.1990). Because *pendente lite* support is, by definition, interim and transient, the right to such support can be irretrievably lost by delay. In deferring Johnson's motion until trial, the court thwarted the purpose of *pendente lite* relief under the statute, which is to maintain the status quo pending trial so as to "enable plaintiff to conduct the case." D.C.Code § 16–916(a); *see Bowie v. Nicholson*, 705 A.2d 290, 292 (D.C.1998); *Fitzgerald v. Fitzgerald*, 566 A.2d 719, 721 (D.C.1989); *see also In re Marriage of McNaughton*, 145 Cal.App.3d 845, 194 Cal.Rptr. 176, 177 (1983) (stating that the purpose of a *pendente lite* support award is "to maintain the living conditions and standards of the parties as closely as possible to the status quo, pending trial"). The trial court's delay in addressing the motion for *pendente lite* support appears to have effectively forced Johnson to give up custody of K. five weeks prior to the trial. Thus, the trial court prejudiced Johnson's "substantial rights" by contributing to one of the factors that entered into the court's analysis of the custodial arrangement which would be in K.'s best interest, *i.e.*, K.'s residence with Washington at the time of trial.

Subsequent to the proceedings in this case, the D.C. Council enacted D.C.Code § 16–2349.1 which deals specifically with child support *pendente lite*.[14] It provides in relevant part:

Upon motion of a party in a paternity or support action or proceeding, the Superior Court *shall* issue an order of child support pending a determination of parentage if there is clear and convincing evidence of paternity.

(Emphasis added.) Thus, under current D.C. law, upon motion of a party in a paternity or support proceeding, the trial court is required to issue an order directing the non-custodial parent to pay temporary child support once there is clear and convincing evidence of paternity.[15] The statute, which no longer permits courts any discretion in ordering temporary child support, illustrates the recognition in this jurisdiction that "the hallmark of a meaningful appropriate pendente lite support order is its expeditious determination." *Langone, supra* note 13, 546 N.Y.S.2d at 536.

Accordingly, given the purpose of *pendente lite* relief and the importance that requests for such relief in custody proceedings be resolved expeditiously, we conclude that the trial court erred in refusing to grant a hearing and deferring until trial Johnson's motion for *pendente lite* child support.[16]

### III.

Were we adjudicating the rights of the parents, it would offend a sense of fairness that in part because of Washington's refusal to pay child support for K., as he was obligated to do as her parent under

14. D.C.Code § 16–2349.1 originally went into effect May 8, 1998, as part of the "Child Support and Welfare Reform Compliance Temporary Amendment Act of 1998." D.C. Law 12–103, 45 D.C.Reg. 3254 (1998). This act was subsequently temporarily repealed on August 12, 1998, by D.C. Act 12–439, 45 D.C.Reg. 6110, 6143 (1998). The act, including D.C.Code § 16–2349.1 in its original form, was re-enacted, effective April 13, 1999. D.C. Law 12–210, 46 D.C.Reg. 3832 (1999). *See* 45 D.C.Reg. 8459, 8471 (1998). D.C. Law 12–210 was also repealed and D.C.Code § 16–2349.1 re-enacted a third time effective March 7, 2000. *See* D.C. Law 13–57, 46 D.C.Reg. 8894, 8906 (1999). This latest temporary law remains in force until October 18,

2000, pending further temporary legislation or the enactment of permanent legislation. *See id.* at 8929. At the time of publication, permanent legislation was pending in committee. *See* D.C. Bill 13–254 (introduced May 13, 1999).

15. In the instant case, we note that Washington has never denied that he is K.'s father.

16. Given the trial court's obligation to rule on Johnson's requests for *pendente lite* support, we note that another recourse for Johnson would have been to petition for a writ of mandamus. *See, e.g., Stebbins v. Stebbins*, 673 A.2d 184, 191 (D.C.1996).

D.C.Code § 16–916(a),[17] *see W.M. v. D.S.C.*, 591 A.2d at 842, he was "rewarded" with primary residential custody of K. In reviewing custody determinations, however, we are constrained to focus our review on the best interests of the *child*, and not on those of the parents *vis à vis* each other. *See In re C.O.W.*, 519 A.2d 711, 713–14 (D.C.1987) ("All persons involved with the child are to be considered in relationship to the best interests of the child, not in comparison to one another."). Thus, even though the importance of ensuring the continuity of K's living arrangement was the finding that led the trial court to award primary physical custody to the father—a finding we recognize was strongly influenced by the absence of *pendente lite* support [18]—our focus on the child's best interest would still require us to sustain the trial court's decision if the conclusion that continuity favors custody with the father is supported by the evidence. Thus, we turn to a review of the trial court's findings and the evidence of record.

◼◼◼ In reviewing a trial court's determination of custody in the case of a child of unmarried parents where both parents have been actively involved in the upbringing of the child, the same criteria apply as in custodial cases involving married parents. *See Ysla v. Lopez*, 684 A.2d 775, 778 (D.C.1996). That is, the court is "[g]uided by the best interest of the child." *Id.; see* D.C.Code § 16–911(a)(5) ("In determining the care and custody of a minor child, the best interest of the child shall be the primary consideration."); D.C.Code § 16–914(a)(3) ("In determining the care and custody of infant children, the best interest of the child shall be the primary consideration."). As the trial court is in a better position to determine what will be best for the child, we will not reverse its determination of child custody except for a "clear abuse of discretion." *Fitzgerald*, 566 A.2d at 721; *see also Ross v. Ross*, 339 A.2d 447, 449 (D.C.1975) (in custody cases, "the law will only dictate reversal [of the trial court's determination] upon a finding of manifest abuse of discretion") (quoting *Rzeszotarski v. Rzeszotarski*, 296 A.2d 431, 440 (D.C.1972)). Child custody cases present complex factual situations, and we necessarily rely on the trial court's careful balancing of the various factors that may impact the child. The trial court is required to make those findings in writing. *See* Super. Ct. Dom. Rel. R. 52(a) ("In all actions tried upon the facts the Court shall make written findings of fact, separate conclusions of law and judgment"); *In re D.I.S.*, 494 A.2d 1316, 1323 (D.C.1985) ("To assure proper review under the abuse of discretion standard, the rules of the court require detailed, written findings of fact and separate conclusions of law on all mat-

---

**17.** D.C.Code § 16–916(a) provides:

Whenever a husband or wife shall fail or refuse to maintain his or her needy spouse, minor children, or both, although able to do so, or whenever any parent shall fail or refuse to maintain his or her children by a marriage since dissolved, although able to do so, the court, upon proper application and upon a showing of genuine need of a spouse, may decree, pendente lite and permanently, that such husband or wife shall pay reasonable sums periodically for the support of such needy spouse and of the children, or such children, as the case may be, and the court may decree that he or she pay suit money, including counsel fees, pendente lite and permanently, to enable plaintiff to conduct the case.

Although D.C.Code § 16–916(a) refers only to married couples, we held in *W.M. v. D.S.C.*, that children born out of wedlock may also receive *pendente lite* support. *See* 591 A.2d at 842.

**18.** Johnson's emergency motion for *pendente lite* support indicated how much money Washington would be obligated to pay Johnson under the Child Support Guidelines, D.C.Code § 16–916.1, and she testified that she had to give up K. to Washington five weeks prior to the trial because she could not make ends meet. Although Johnson did not specifically demonstrate how the additional support from Washington would have ensured that she could adequately provide for K. if she had physical custody of the child, we assume for present purposes that *pendente lite* support would have enabled her to do so.

ters.") Therefore, we base our review solely on the trial court's findings that both parents "love the minor child and are good parents who have the best interest of the minor in mind" and that it is in her best interest to "have continuity in her environment." [19]

 We do not pretend that the trial court's decision to award primary residential custody to Washington was an easy one, or the only one it could have made; but it is one supported by the record. It is abundantly clear from the record, as the trial court expressly found, that both parents love K. very much and that K. is close to both her mother and father. The trial court recognized these strong bonds by granting joint legal custody to the parents. We recognize Johnson's interest in developing a bond with her child. *See Ysla*, 684 A.2d at 781–82 (noting that a court may "consider the interest of a parent in his or her relationship with the child in fashioning a custody order"). Although we do not condone Washington's failure to pay child support as required, *see* D.C.Code § 16–916, on review of a custody determination, our focus must be on whether the trial court's ruling was made in the best interest of the child, not on whether a parent has unclean hands. *See Edmonds v. Edmonds*, 146 A.2d 774, 776 (D.C.1958) (noting in a child support case, which adjudicates the rights of the child, that "the welfare of the child should not be prejudiced by the delictum of a parent."). On the record before us, we cannot say that the trial court clearly abused its discretion in determining that it was in the child's best interest to award primary residential custody of K. to Washington in order to maintain "continuity in her environment,"

as it was undisputed that K.'s residence had changed a number of times in her young life.[20]

Johnson has not challenged the completeness of the trial court's written findings of fact, nor requested a remand, perhaps because there was other uncontested evidence supporting the trial court's decision that it was in K.'s best interest that Washington be awarded primary residential custody. *Cf. Kieffer v. Kieffer*, 348 A.2d 887, 891 (D.C.1975) (no remand required "where the factual matters dispositive of the action appealed are no longer in dispute"). Washington had the more stable and supportive living arrangement for a young child. Washington testified that his mother, grandmother, and other family members were always available during the day to help Washington take care of K., which was supported by testimony from his mother and grandmother and even Johnson, who recognized that this was the case. In addition, Washington stated that there were a lot of children in the neighborhood with whom K. could interact.[21] More importantly, although he did indicate an interest in eventually moving out, Washington had consistently resided in his mother's house for much of his life.

In contrast, testimony at trial demonstrated that Johnson's residential situation was unsettled at best. Prior to moving in with Washington in November 1995, Johnson had been evicted from her home in Maryland for her failure to pay rent. Immediately after Johnson was forced out of Washington's home, K. had to sleep on the floor in Johnson's sister's apartment. Johnson had no alternative living arrangements and she had to place K. in Washing-

---

19. As this opinion makes clear, it would have been preferable if the trial court had made more findings, which we believe were supported by the evidence, justifying its custody determination.

20. Johnson, of course, may move to have the custodial award modified if "there has been a substantial and material change in circumstances and [ ] such modification or termi-

nation is in the best interest of the child." D.C.Code § 16–911(a–2)(4)(A). As noted earlier, the trial court indicated a willingness to review the initial custodial arrangement. See *supra* note 11.

21. In contrast, Johnson testified that the only other child in the vicinity of her apartment was her sister's son.

ton's care. Because of her poor credit history, Johnson was unable to move into her own apartment until Washington obtained a lease for her. Once there, she took K. back in February 1997, where K. stayed for just over six months until, as a result of Washington's failure to pay child support to Johnson during that period, Johnson again returned K. to Washington's care. The court clearly expressed its concern about the effect of the constant upheaval in K.'s life from moving from place to place, commenting, "I'm not getting the sense that either one of you have very much appreciation for—I mean, you don't just pick up a child and change the child's whole life around, you know, from one point to the next. I mean, you make some effort to have some kind of continuity in a little person's life."

In addition, while there was testimony demonstrating that Washington had a strong support network to help him care for K., Johnson did not present any evidence to demonstrate a similar system of support. Although Johnson's sister lived across the hall from Johnson, and had taken care of K. during the day before K. started attending day care, there was no indication that Johnson's sister was capable of providing the same quality of care in Johnson's absence as could Washington's family in his absence, especially once Johnson's sister began working. Moreover, Johnson herself recognized the child care support system available to Washington when she testified that she gave up custody of K. five weeks before trial, after no longer being able to afford day care without support from Washington, because she knew that Washington's "mother's gonna take care of her. . . . I know that his mother is a good grandmother. I can rely on her. If I need day care and he's not doing for me, why should I just take her to anybody? I know that his mother is reliable, I'm gonna take her there." [22]

\* \* \* \*

In conclusion, the trial court erred in not timely considering and ruling on Johnson's request for *pendente lite* support. This failure contributed to Johnson's decision to turn K. over to live with her father five weeks before the custody trial, a factor that the trial court considered in making the custody determination. As the record supports the trial court's finding that K.'s best interest would be served by having continuity in her environment and its ultimate determination that Washington could provide a stable living environment, we must affirm the trial court's judgment.[23] So as to avoid possible inequities created by the parents'. actions, however, we stress the importance that the trial court resolve *pendente lite* support matters as expeditiously as possible, calendar pressures notwithstanding, and certainly prior to the time when the situation becomes dire for the petitioner.

*So ordered.*

---

**22.** Johnson further testified:
> When I was staying there, they always provided for [K.]. So, you know, because he have a in-house baby-sitter and they always provide for her, it would [be] easier for her to stay with them than to stay with me.

**23.** We are acutely aware that it has now been more than two and a half years since the trial court's custody determination, adding to the continuity factor that could affect the calculus of any requested change in custody. See *supra* note 11.