*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-FM-0244

GREGORY TERRELL BOWLDING, APPELLANT,

V.

SAMUEL MACK, III, *et al.*,
APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2021-DRB-000130)

(Hon. Steven M. Wellner, Trial Judge)

(Argued April 2, 2024                    Decided October 24, 2024)

*Massiel Leiva*, with whom *Shirley Diaz*, *Robert Warnement*, *Stephanie McClellan*, and *Marla Spindel* were on the briefs, for appellant.

*James Whitehead*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellee Samuel Mack.

*Alexandra Drobnick*, *Jeffrey Wettengel*, and *Sarah Zhang* filed a brief on behalf of the Domestic Violence Legal Empowerment and Appeals Project as amicus curiae in support of appellant.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*:   This appeal is from a custody dispute over S.M., who is now seven years old.   S.M. lived with his mother, Erica Ward, for the first eleven months of his life.   He then lived with his father, Samuel Mack, for the next two-and-half years, at which point it is alleged that Mack killed Ward in S.M.'s presence.   Following Ward's death and Mack's arrest, S.M. stayed with his maternal uncle and the appellant in this case, Gregory Bowlding, for eight days.   Since then, S.M. has lived with Mack's adult daughter and S.M.'s half-sister, Samaya.

This case arises from Bowlding's suit seeking third party custody over S.M. That is, Bowlding sought custody despite not being S.M.'s parent or de facto parent. D.C. Code § 16-831.01(5).   The trial court dismissed Bowlding's suit for lack of statutory standing, concluding that he did not satisfy any of the statutory categories under which third parties are permitted to petition for custody of a minor.   D.C. Code § 16-831.02(a)(1).   The trial court further rejected Bowlding's argument that he had standing to seek custody "as a matter of pre-existing common law or through the [trial court's] equitable powers."

Bowlding now appeals and presses two arguments.   He first argues that he has statutory standing under D.C. Code § 16-831.02(a)(1)(C), which allows a third party to seek custody so long as they are "living with the child and some exceptional circumstance exists such that relief under this chapter is necessary to prevent harm

to the child." While Bowlding acknowledges that he was not in fact living with S.M. at the time he filed his suit for custody, he argues that we should read section 16-831.02(a)(1)(C) expansively under the circumstances and conclude that he "constructively" lived with S.M. in the relevant statutory sense. Bowlding next argues that the third party custody statute expressly does not abolish "the court's common law or equitable jurisdiction" to afford him relief, D.C. Code § 16-831.13, so that even if he does not satisfy any of the statutory bases for third party standing he "has common law or equitable causes of action." We disagree with Bowlding on both points and affirm.

## I. Facts

The relevant facts are not in dispute, and in this procedural posture we take the facts alleged in Bowlding's amended complaint as true. *Grayson v. AT&T Corp.,* 15 A.3d 219, 228 (D.C. 2011) (en banc).

S.M. was born in April 2017 and lived with his mother, Erica Ward, for the first eleven months of his life. S.M. then moved in with Samuel Mack, his father, who raised S.M. for the next two-and-a-half years with help from his daughter, Samaya. When S.M. was three-and-a-half years old—on December 30, 2020—Mack allegedly shot and killed Ward in S.M.'s presence. Mack is charged with murdering Ward, with a trial currently scheduled to begin next year. It appears from

the record before us that Mack does not deny shooting Ward, though he claims to have done so accidentally. Mack was arrested at the scene and S.M. spent the night with one of Ward's friends.

Bowlding took S.M. into his home the next day and S.M. stayed with him for eight days—from December 31, 2020, to January 8, 2021. The District's Child and Family Services Agency, or CFSA, then convened a "Family Team Meeting" on January 8, 2021, though it never instituted parental neglect proceedings against Mack or otherwise sought to limit his parental rights.[1] While Mack was detained at that time, he relayed his preference that S.M. be placed into Samaya's custody. At the end of the Family Team Meeting, which Bowlding attended, CFSA honored that preference and memorialized a plan directing that S.M. be placed with Samaya. Bowlding complied with CFSA's plan and surrendered S.M. over to Samaya's care that same day.

---

[1] There seem to have been statutory grounds for a neglect case—at least during the nine days after Ward's death and before S.M.'s placement with Samaya—under D.C. Code § 16-2301(9)(A)(iii). That section defines a "neglected child" as including one whose parent is "unable to discharge his or her responsibilities . . . because of incarceration" (presumably like Mack, S.M.'s lone living parent, in the days after his arrest). For whatever reason—perhaps a very good one that is simply not obvious to us—CFSA has never initiated neglect proceedings. The wisdom of that decision is immaterial to the statutory interpretation questions considered below.

Bowlding then sued for third party custody of S.M. thirteen days later, on January 21, 2021. He later supplemented that filing with an emergency motion seeking temporary custody of S.M., a complaint, and an amended complaint further refining his claims. In his pleadings, Bowlding indicated that he was "seeking full custody [of S.M.] due to the incarceration of his biological father for the homicide of his biological mom." He further asserted (1) that he surrendered custody of S.M. to Samaya only because he believed he was required to comply with CFSA's directives to do so, (2) that Samaya had cut S.M. off from Ward's side of the family, and (3) that he feared S.M. could be experiencing PTSD given that he apparently witnessed his mother being killed. The trial court denied Bowlding's request for temporary custody and appointed guardians ad litem to represent S.M.'s interests.

Mack and his daughter Samaya, who had intervened in the case, moved to dismiss the complaint on the grounds that Bowlding did not have standing to seek custody. They argued that Bowlding did not fit into any of the three categories of third parties who are permitted to initiate a custody suit. *See* D.C. Code § 16-831.02(a)(1)(A)-(C). Bowlding countered that he satisfied one of the statutory bases for third party standing, which is that he "is living with the child and some exceptional circumstance exists such that relief under this chapter is necessary to prevent harm to the child." *Id.* § 16-831.02(a)(1)(C). While he acknowledged that he was not in fact living with S.M. at the relevant time, when he sued for custody,

he argued that the court should interpret this provision broadly where he turned S.M. over to Samaya's custody only at CFSA's direction, and then with relative promptness (thirteen days later) sued for custody. In any event, Bowlding argued that he did not need to satisfy any of the statutory bases for standing because section 16-831.13 expressly preserves "the court's common law or equitable jurisdiction" "to hear and adjudicate custody claims," and that such jurisdiction existed here.

The trial court dismissed Bowlding's complaint for lack of standing. It reasoned that Bowlding was not "living with" S.M. at the time of his complaint, so that he could not satisfy the requirements of section 16-831.02(a)(1)(C). Bowlding's contrary interpretation of the statute would require "disregarding the plain language of the statute, as well as its clear intent," in the trial court's view. And even if Bowlding had satisfied (a)(1)(C)'s "living with" requirement, the court further concluded that Bowlding had not made the required showing that granting him custody was "necessary to prevent harm to the child," where Bowlding's principal claim of harm was that S.M. had been alienated from extended family on his maternal side.

As for Bowlding's argument that he had equitable or common law standing, as preserved by section 16-831.13, the court reasoned that Bowlding had not identified any precedent or "principle under which [he] would have standing in this

case or be entitled to an award of custody." The court further opined that to adopt Bowlding's reading of section 16-831.13—that third parties always have standing to seek custody whenever the equities warrant it—"would swallow the standing test" set out in section 16-831.02. The court reasoned that "in the realm of child custody," any equitable or inherent jurisdiction in the District's courts is "narrow" and "limited to situations not amenable to resolution through statutory law." Quoting from this court's opinion in *In re A.W.K.*, the court explained that the comprehensive statutory scheme governing third party custody suits evinced that the "legislature had . . . sought to limit the court's inherent authority in that area." 778 A.2d 314, 319 (D.C. 2001).

Bowlding now appeals.

## II. Analysis

Bowlding argues that he has standing to seek custody of S.M. on the same two bases that he advanced before the trial court: (1) that he was "living with" S.M. in the relevant sense required by section 16-831.02(a)(1)(C), and that in any event, (2) the trial court had equitable or common law jurisdiction to consider his claims, as expressly preserved by section 16-831.13. We address these arguments in turn.

## A. Bowlding was not "living with" S.M. when he filed his complaint

Bowlding first argues that he had statutory standing to seek custody of S.M. under section 16-831.02(a)(1). That provision permits third parties—i.e., somebody who is neither a parent nor a de facto parent, *id.* § 16-831.01(5); *see also id.* § 16-831.01(1) (defining "De facto parent")—to seek custody of a child if they fit into any of three categories. The first category is when a parent "who is or has been the primary caretaker of the child within the past 3 years consents," a circumstance that Bowlding concedes does not apply here. *Id.* § 16-831.02(a)(1)(A). The second category is when the third party has "[l]ived in the same household as the child for at least 4 of the 6 months immediately preceding the filing," or for "half of the child's life" if they are less than 6 months old, and has been the child's primary caretaker during that time. *Id.* § 16-831.02(a)(1)(B)(i)-(ii). Bowlding again concedes he does not satisfy those conditions.

The third category, and the one that Bowlding argues pertains here, is where "[t]he third party *is living with* the child and some exceptional circumstance exists such that relief under this chapter is necessary to prevent harm to the child." *Id.* § 16-831.02(a)(1)(C) (emphasis added). The parties agree, as do we, that this statutory language requires an assessment of where the child is living at the time a third party complaint for custody is filed.

In interpreting this statutory provision, we begin with the text. If it is "clear and unambiguous and will not produce an absurd result, we will look no further." *Velasquez Cardozo v. United States*, 315 A.3d 658, 664 (D.C. 2024) (en banc) (quoting *Eaglin v. District of Columbia*, 123 A.3d 953, 956 (D.C. 2015)). The plain text is fatal to Bowlding's argument. Bowlding was not in any sense "living with" S.M. when he filed for custody. At that point, S.M. had been living with Samaya for thirteen days.

Bowlding does not really dispute that conclusion, but he nonetheless counters that he "constructively satisfied" the statute's "living with" requirement because he *would have been* living with S.M. at the time he filed his complaint but for CFSA's directive to turn S.M. over to Samaya's care. That backdrop, he argues, should compel this court to read the "living with" requirement capaciously so that it applies in these circumstances. We disagree. This is a mere policy argument asking us to ignore the plain text of section 16-831.02(a)(1)(C) and to contort it so that it captures the circumstances we are confronted with today. But as judges charged with interpreting rather than writing the laws, we are not free to accept that invitation; the law says what it says, whether we like it or not. *See Booz Allen Hamilton Inc. v. Off. of Tax & Revenue*, 308 A.3d 1205, 1215 (D.C. 2024) ("[P]olicy arguments" do not raise "the kind of extraordinary and exceptional circumstances that might provide a basis for disregarding the text" of a statute.); *Allman v. Snyder*, 888 A.2d 1161, 1169

(D.C. 2005) ("It is not within the judicial function . . . to rewrite the statute or to supply omissions in it, in order to make it more fair." (citation omitted)).

To be sure, there may be close calls where reasonable minds could disagree about whether a child lives with a particular individual at a given time. But this case raises no such difficult questions. There is no reason to doubt that S.M. lived with Samaya, and not Bowlding, at the time Bowlding filed his custody complaint. While S.M. had only lived with Samaya for thirteen days at that time, that living arrangement had at least a semblance of permanence, more so than S.M.'s briefer stay with Bowlding. Samaya had agreed to take care of S.M. indefinitely with the consent of a parent and the blessing of CFSA. And Bowlding's own argument is premised on the view that an even briefer stint staying with him, lacking those indicia of permanence, satisfied the statute's "living with" requirement. To accept the premise of Bowlding's argument logically requires the further conclusion that S.M. was living with Samaya, and not Bowlding, after staying with her for thirteen days. There are no circumstances that would cast doubt on that conclusion.

Bowlding further complains that enforcing the statutory scheme as written would be unfair to the "unsophisticated litigant" like him who surrendered custody over S.M. only because he mistakenly believed CFSA had the authority to direct him

to do so, and who then with reasonable promptness sued for S.M.'s return.[2]  But this again is a policy argument, and no matter how sympathetic it may be, it is not a basis on which we might disregard the plain text of section 16-831.02(a)(1)(C).  *Booz Allen*, 308 A.3d at 1215; *Allman*, 888 A.2d at 1169.

Bowlding's appeals to fairness are also not so compelling.  Bowlding would have had standing to bring his complaint under section 16-831.02(a)(1)(B) if only he had lived with and been S.M.'s primary caretaker for "4 of the 6 months immediately preceding" his suit.  In other words, if S.M. had lived with Bowlding for four months prior to moving in with Samaya, then Bowlding would have had a two-month buffer to file his suit.  The seeming harshness that Bowlding complains about thus does not lead to any overarching absurdity in requiring third parties to race to court under impossible timelines in order to preserve their rights to seek custody.  It instead stems more directly from the fact that Bowlding lived with S.M. for only eight days.  When the living arrangement is as brief as it was here, we see

---

[2] We do not engage with Bowlding's arguments that CFSA lacked authority to direct him to surrender S.M. into Samaya's care because it is immaterial to our conclusion that S.M. was not living with him at the relevant time.  Nor do we give any weight to Mack's argument that the notes from the Family Team Meeting reflect others who, like Samaya, volunteered to care for one or more of Ward's children, whereas Bowlding gave no indication that he was willing to care for any of the children and he voiced no objection to placing S.M. with Samaya.  Bowlding suggests those notes are inaccurate or incomplete, and at the motion to dismiss stage, we assume that allegation as true.

nothing irrational or untoward about the legislature limiting the third party's right to seek custody to the particular timeframe when the child is in fact living with them. Where the existing living arrangement is the only hook that gives the third party standing in the first place—and not a more protracted or significant relationship—then when the hook disintegrates, there is nothing absurd about standing dissipating as well.

In sum, S.M. was not living with Bowlding at the time he filed his custody complaint, so Bowlding lacks standing under section 16-831.02(a)(1)(C). We do not address the parties' and amicus's arguments regarding whether Bowlding satisfied 16-831.02(a)(1)(C)'s additional requirement, to show that "some exceptional circumstance exists such that relief under this chapter is necessary to prevent harm to the child," because Bowlding lacks standing under this section in any event.

**B. Bowlding does not have equitable or common law standing to proceed**

Bowlding next argues that he has standing per the third party custody statute's savings clause, D.C. Code § 16-831.13. Both that savings clause and the just-examined section 16-831.02 were passed as part of the "Safe and Stable Homes for Children and Youth Amendment Act of 2007." D.C. Law 17-21 (Sept. 20, 2007),

codified at D.C. Code §§ 16-831.1 to .13, 21-2301. The savings clause that Bowlding relies on says:

> Nothing in this chapter shall be construed to limit the ability of any person to seek custody of a child under any other statutory, common law, or equitable cause of action or to preempt any authority of the court to hear and adjudicate custody claims under the court's common law or equitable jurisdiction.

Bowlding floats two different interpretations of this savings clause that he contends permit him to proceed with his suit—a broader one and a more modest one. We consider them in turn.

### 1. This court cannot craft new bases for third party standing

Bowlding's broader reading of the savings clause is that it permits the District's courts to "confer equitable standing on" any party, subject to "the unique facts of a case," whenever "extraordinary circumstances" warrant it. He argues that extraordinary circumstances justify his suit because it is necessary to "protect S.M. from harm," so that he therefore has standing. Unlike Bowlding's first argument, this one cannot be adjudged on the statutory text alone because we need some background understanding of what this court's "common law or equitable jurisdiction" was—and what the D.C. Council understood it to be—when it passed the Safe and Stable Homes Act. After examining that background, we conclude that

Bowlding's argument is not compatible with either the history or the text of the statute.

a. *W.D. v. C.S.M.* and the common law backdrop of the Act

To understand the Safe and Stable Homes Act we begin with its catalyst, which was this court's decision in *W.D. v. C.S.M.*, 906 A.2d 317 (D.C. 2006).[3] *W.D.* involved a newborn child who had tested positive for cocaine at birth and, with neglect proceedings quickly instituted based on the mother's apparent (and ultimately adjudicated) unfitness, the child spent the bulk of his first year of life living with foster parents. *Id.* at 319. As the child's first birthday approached and with neglect proceedings still underway, the foster parents instituted a separate action for permanent custody. *Id.* The trial court in that separate action granted the foster parents custody over the objections of the father, who was notified of his parenthood only after the mother's underlying neglect. *Id.*

---

[3] The Council's Committee on Public Safety and the Judiciary explained that the "purpose of th[e] legislation is to fill a statutory hole that was revealed after [this court] decided the case of *W.D. v. C.S.M.*" Safe and Stable Homes for Children and Youth Amendment Act of 2007, Report on Bill No. 17-41 before the Committee on Public Safety and the Judiciary, Council of the District of Columbia, at 2 (June 4, 2007) ("Judiciary Comm. Rep."), lims.dccouncil.gov/downloads/LIMS/ 18466/Committee_Report/B17-0041-CommitteeReport2.pdf?Id=62026; https://perma.cc/NZ6B-GNCP. The "Legislative Chronology" recounted in that same report begins with this court's decision in *W.D.*, followed immediately by the first draft of the bill introduced before the Council. *Id.* at 3.

We reversed, holding that third parties generally do not have any rights to seek custody over the parents' objections outside of the District's "comprehensive and extensive" "statutory procedures governing abused and neglected children." *Id.* at 325, 327. That is, absent parental consent, third parties are not permitted "to bypass the operation of the neglect statutes" because "the legislature has preempted the power of the court to exercise its inherent authority to override the procedures established for determining the future of abused and neglected children." *Id*. at 325.

In a rather opaque footnote of potential consequence to this case, we then rejected the foster parents' argument "that the trial court has authority to adjudicate custody disputes between biological parents and third parties as a matter of the court's basic equity jurisdiction," reasoning that none of the eight cases the foster parents relied upon for that proposition "arose in the factual context presented here." *Id.* at 325 n.17. While that footnote is far from clear, it suggests that third parties can pursue an independent action for custody if they can point to a specific analog in this court's precedents, arising in the same "factual context," under which they might ultimately be afforded relief, i.e., a grant of custody.[4] Aside from that narrow

---

[4] Six of the eight cases the footnote cites predate the District's neglect apparatus, which was established in July of 1970. *See* District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, § 121(a), 84 Stat. 473, 522 (July 29, 1970). They are easy to reconcile with *W.D.*'s core holding, which

potential carve-out, *W.D.* reasoned that independent suits for third party custody were simply incompatible with the District's comprehensive neglect statutes.

Bowlding argues that *W.D.* should be read more narrowly to mean that the District's neglect statutes preempt independent third party custody suits only when "a parallel neglect action" is in fact underway, which was the case in *W.D.*, but is not the case here. Assuming that *W.D.* itself does not foreclose that position,[5] it is

---

would seem to say that any equitable authority to adjudicate those custody disputes was displaced by the neglect statutes. As for the other two cases, both involved children who had been deemed neglected—or its equivalent of "dependent" under the pre-1970 regime—and had been in state custody and placed with foster parents for many years. *In re N.M.S.*, 347 A.2d 924, 925-27 (D.C. 1975) (per curiam) (Child had spent nine years "in the custody of the Social Rehabilitation Administration," and "[h]aving been previously adjudged a 'dependent child', the child continued in that status and there was no necessity for a 'neglected child' finding."); *In re J.S.R.*, 374 A.2d 860, 862 (D.C. 1977) (Child had been "found to be homeless and without adequate care" before 1970 and spent nearly his entire life in foster care after having been "committed to the Department of Public Welfare" shortly after birth.). So those cases likewise do not seem to be in any tension with *W.D.*'s core rationale, because they seem to have arisen from neglect proceedings. While *W.D.* is unclear about how it meant to distinguish these eight cases, the easiest way to do so is that none of them actually considered whether a third party custody suit could be raised in an independent action after the District's neglect statutes were passed in 1970, so they needed no reconciliation at all.

[5] The foster parents in *W.D.* argued "that they could have filed for custody of the child . . . even if there had never been a neglect proceeding" because "there need not be specific statutory authority to adjudicate disputes between biological parents and third parties." 906 A.2d at 324. We seemed to reject that argument when we said that it would "effectively bypass[] the extensive protections for the parent and child that govern neglect proceedings" to allow a third party to petition for custody

simply not a sensible limitation on *W.D.* Under Bowlding's reading, parents who had been deemed neglectful or were still in the midst of neglect proceedings would alone enjoy the "extensive and substantial" "protections afforded by the child neglect statutes," including the mandatory "efforts to reunify the family" that "are an integral part of the child neglect statutory scheme." *Id.* at 321-22. By contrast, parents who had never even been suspected of neglect, or had been investigated and cleared of any wrongdoing via concluded neglect proceedings, could be freely dragged into court by third parties seeking custody of their children. That would be a very strange result. We observed in *W.D.* that even neglectful parents were entitled to the comprehensive protections of the neglect statutes, so that "[c]learly, a parent who was found . . . not to have neglected the child . . . would be entitled to such protections," and it is even clearer still that a parent who was not even alleged to be neglectful would enjoy the same protections. *Id.* at 325. Because Bowlding's limited reading of *W.D.* is not the most natural reading of the case on its own terms, *see supra* note 5, and would lead to anomalous results, we reject it.

Perhaps more important to the question of statutory interpretation that we now confront, the D.C. Council generally understood *W.D.* to have announced the

---

"before the child had been adjudicated neglected," *id.* at 323, a holding that seems to apply regardless of whether neglect proceedings are underway. But we acknowledge *W.D.* was not clear on this point.

broad principle that third parties had no rights to seek custody outside of the neglect apparatus. We now explain that point and its importance.

### b. The legislative history is fatal to Bowlding's broad interpretation

In a nutshell that we crack open in a moment, the D.C. Council extensively considered and rejected the precise position that Bowlding advances today—that the District's courts should be able to entertain third party custody suits whenever "exceptional circumstances" warrant it. So to adopt Bowlding's reading of the savings clause would resurrect a carefully considered and specifically rejected version of the legislation. That is simply untenable. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (rejecting interpretation of statute where "Congress considered and rejected bills that" mirrored that interpretation).

The first draft of the Safe and Stable Homes Act was introduced just four months after our decision in *W.D.*, and the professed "background and need" for the legislation was to counteract *W.D.* Judiciary Comm. Rep. at 1-2; *see also supra* note 3. The Council explained that *W.D.* had "been broadly interpreted to hold that trial courts have *no authority* as a matter of law to entertain custody suits brought by non-

parents such as a grandparent with physical custody of a child."[6] *Id.* at 2 (emphasis added). The Council bemoaned *W.D.* as requiring third parties "to seek relief by resorting to the child neglect statutory framework," and it sought to allow "certain persons other than parents to seek and obtain custody of a child" outside of that neglect apparatus.[7] *Id.* Who those certain persons would be was the subject of extensive debate and numerous revisions throughout the drafting process, with the

---

[6] The lead sponsor of the bill was then-newly-elected Councilmember Tommy Wells, who had been the director of the D.C. Consortium for Child Welfare months earlier, when *W.D.* was decided. As the director of that group, Wells headed a coalition of organizations who quickly filed an amicus brief with this court asking us to overturn *W.D.* en banc. Amicus Brief in Support of Petition for a Rehearing or Rehearing En Banc, *W.D. v. C.S.M.*, 906 A.2d 317 (D.C. 2006) (Nos. 99-FM-1138 & 99-FM-1299). That amicus brief describes *W.D.* as "severely limiting, if not completely eliminating, the ability of non-parents to file a complaint for custody." *Id.* at 5.

[7] The "Background and Need" section of the Judiciary Committee's report also quoted a recent article in the Washington City Paper which described *W.D.* as concluding that courts do "not have the authority to take custody of a child away from a parent and give it to a non-parent." Judiciary Comm. Rep. at 1 (quoting Arthur Delaney, *Court decision threatens D.C.'s grandparent custodians*, Wash. City Paper (Dec. 8, 2006), law.udc.edu/wp-content/uploads/2021/03/fraidin_ citypaper_120806.pdf; https://perma.cc/FWE7-EP85). The Council was aware of the alternative reading of *W.D.* that Bowlding advances here, noting that "some have argued that [*W.D.*] is only applicable to custody actions where there is an open neglect case." Safe and Stable Homes for Children and Youth Amendment Act of 2007, Report on Bill No. 17-41 before the Committee on Human Services, Council of the District of Columbia, at 1-2 (March 23, 2007). But it understood that was not the prevailing reading of *W.D.*, which had generally been more "broadly interpreted" to bar third party custody suits with or without an underlying neglect proceeding. Judiciary Comm. Rep. at 2.

Council ultimately landing on de facto parents, D.C. Code § 16-831.03, and the three categories of third parties identified in section 16-831.02 (those acting with parental consent, those living with the child for four of the previous six months while acting as a primary caretaker, and those living with the child as necessary to prevent harm in exceptional circumstances).

The first draft of the bill introduced in the Council—complete with a savings clause that did not materially change throughout the drafting process—would have permitted any third party to "file a complaint for custody of a child" or to "intervene in any existing action involving custody of the child." *See* Draft of Bill No. 17-41, §§ 16-2002(a), 16-2012 (Jan. 9, 2007). That language was narrowed in the second draft of the bill after a markup by the Human Services Committee that would have effectively mirrored the interpretation of the Act that Bowlding advances today: It defined three categories of third parties that could seek custody, plus it had a catch-all standing provision allowing third parties to petition for custody under any "[o]ther exceptional circumstances." Safe and Stable Homes for Children and Youth Amendment Act of 2007, Report on Bill No. 17-41 before the Committee on Human Services, Council of the District of Columbia, at 12 (March 23, 2007).

The responses to that second draft were quite critical of the proposed catch-all provision and the Council then discarded it. The Office of the Attorney General

wrote a letter to Chairman Phil Mendelson criticizing the "exceptional circumstances" catch-all provision as one of two provisions "[o]f most concern" because it believed that neglect proceedings were the proper forum for adjudicating such matters. Judiciary Comm. Rep., Attachment, Letter from Linda Singer, Att'y Gen. for D.C. at 2 (PDF at 124) (May 23, 2007). A coalition of ten entities and individuals—including the Legal Aid Society of the District of Columbia, the ACLU of the National Capital Area, and the director of the Domestic Violence Legal Empowerment and Appeals Project—opposed the draft legislation, noting that the catch-all was "profoundly flawed" because it permitted "virtually anyone to sue" for custody, even if the parents were fit and the child had not been neglected. Judiciary Comm. Rep., Attachment, Letter from Jonathan Smith, Exec. Dir. for The Legal Aid Soc'y of D.C., *et al*. at 1-2 (PDF at 56-57) (Apr. 24, 2007). While the catch-all had its supporters, *see*, *e.g.,* Judiciary Comm. Rep., Attachment, Testimony of Judith Sandalow, Exec. Dir. of the Children's Law Ctr. (PDF at 36-44) (Apr. 24, 2007), the Committee noted that it "worked closely with" the competing interests above "to find changes acceptable to both," and "incorporated" those changes in the final draft that omitted the exceptional circumstances catch-all provision, Judiciary Comm. Rep. at 5. It omitted that catch-all because, the Council noted, it was "mindful of the sanctity of [a] parent's rights" and wished to "narrowly tailor[] th[e] bill's third party standing" requirements. *Id.* at 2.

That history reveals the Council's deliberate and considered choice to reject third party standing based on a mere judicial assessment that exceptional circumstances warranted it. The Council understood the prevailing view that this court in *W.D.* had eliminated any third party rights to initiate custody proceedings absent parental consent. The Council then statutorily reinvigorated third party standing in the limited circumstances delineated by section 16-831.02(a)(1)(A)-(C). The savings clause was a cautionary acknowledgement that perhaps some other statutory or common law bases for third party standing existed, and in that possible (albeit unexpected) case, the Council did not mean to abolish it. But as for Bowlding's position that we may confer standing on third parties based on a mere judicial assessment that exceptional circumstances warrant it, that particular basis for standing was carefully considered and directly rejected by the Council, so it is a non-starter.

### c. The statutory text also runs contrary to Bowlding's broad interpretation

While we acknowledge that the statutory text alone does not resolve the question at hand, it similarly counsels against Bowlding's broader reading of the Act. Mindful that statutory provisions should be interpreted in light of "the broader context of the statute as a whole," *Webb v. United States*, 318 A.3d 502, 504 (D.C. 2024) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion)),

there are strong textual reasons to conclude that Bowlding's reading is not a viable one.

The biggest textual difficulty for Bowlding's position is that section 16-831.02, which is the cornerstone of the Safe and Stable Homes Act, carefully delineates three categories of third parties who may move for custody of a child. So to read section 16-831.13 as Bowlding suggests—as a catch-all that covers everybody else depending on a fact-specific evaluation of their circumstances— would cut the heart out of the Act. *See generally OverDrive, Inc. v. Open eBook F.*, 288 A.3d 305, 316-17 (D.C. 2023) (Courts do not have "freestanding equitable authority to address and remedy . . . 'unfair[ness]'" in the face of an "exhaustive [statutory] scheme."); *In re A.W.K.*, 778 A.2d at 319 (This court has no "general equitable powers" to resolve custody disputes where the legislature has "sought to limit the court's inherent authority.").

Query why the Council would bother to define the three categories of third parties with standing in section 16-831.02 if their next breath was "and everybody else too, when circumstances warrant it." If that is what the Council intended—and as the legislative history makes clear, it was not—it might have omitted section 16-831.02 and simply provided in its place that third parties have standing to seek custody whenever a judge deems that extraordinary circumstances exist or

whenever it is in the child's best interests. That is emphatically not what the Safe and Stable Homes Act codified. As we explained in *B.J. v. R.W.*, "whether the petitioner has standing to seek custody precedes" any "inquiry into the child's best interests." 266 A.3d 213, 217 (D.C. 2021).[8]

Under Bowlding's reading, the savings clause would be the proverbial tail that wags the dog. Or, as the trial court aptly put it, it would "swallow the standing test set out in D.C. Code § 16-831.02(a)(1)(A)-(C)" whole. Statutory savings clauses like this one should generally not "be construed as continuing . . . a common law right, the continued existence of which would be absolutely inconsistent with the

---

[8] Mack argues that *B.J.* has already answered the question before us and held that a third party who cannot meet the standing requirements in section 16-831.02 never has standing to bring a third party custody suit. That is a plausible reading of *B.J.*, where we rejected an argument that the third parties "did not need to satisfy the statutory standing requirements for the court to grant them custody if to do so would be in [the child's] best interests." 266 A.3d at 215. We said that the third party in that case "d[id] not meet any of the[] statutory requirements" in section 16-831.02, and "[f]or that reason, we affirm[ed] the trial court's ruling" that she lacked standing to proceed. *Id.* at 214. While *B.J.* did not expressly discuss the savings clause, it did note that the intervenors (an aunt and two grandmothers) did not have standing under "any other provision of the Safe and Stable Homes Act"—like the savings clause—despite their allegations that it would be in the child's best interests to grant them custody. *Id.* at 217. Still, on balance, because *B.J.* never expressly addressed the meaning of section 16-831.13's savings clause, it does not appear to us that "the judicial mind ha[d] been applied to and passed upon the precise question" presented here regarding the savings clause's meaning, so it is not binding on that point. *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) (quoting *Fletcher v. Scott*, 277 N.W. 270, 272 (Minn. 1938)) (distinguishing between dicta and holdings).

provisions of the act," because an act should not "be held to destroy itself." *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 227-28 (1998).

Bowlding counters that this court's decision in *W.H. v. D.W.* supports his reading of the savings clause. 78 A.3d 327 (D.C. 2013). It does the opposite. *W.H.* affirmed an order granting joint custody of a child to a stepbrother who had standing to sue for custody under section 16-831.02(a)(1)(B) and a grandmother who did not satisfy any of the statutory standing provisions in section 16-831.02. *Id.* at 339. Bowlding argues that *W.H.* supports his standing claim given that we approved a grant of joint custody to a grandmother with no standing in her own right. The problem for Bowlding is that we made crystal clear in *W.H.* that the grandmother "d[id] not have standing under the Act" to petition for custody. *Id.* at 331. She could be awarded joint custody only in conjunction with a third party, the stepbrother, who did have standing. We later distinguished *W.H.* on that very ground in *B.J.* where, like in this case, the third party was "not seeking to share custody with another party who meets the Act's standing requirements" so that her suit was properly dismissed for lack of standing. 266 A.3d at 215. *W.H.* thus undercuts rather than supports Bowlding's position; just as in *B.J.*, this case rises and falls on Bowlding's own standing to seek custody. Unlike the grandmother in *W.H.*, there is no third party with statutory standing who Bowlding might piggyback on.

*2. There is no precedential analog under which Bowlding has standing to sue*

Bowlding's more modest reading of the savings clause is that he has standing so long as this court's jurisprudence at the time of the Safe and Stable Homes Act's passage, post-*W.D.*, would have permitted him to obtain custody of S.M. We agree with him so far as that goes, though as we have explained, the Council was under the general impression that *W.D.* left no residual authority for courts to entertain third party custody suits outside of the neglect apparatus and that is perhaps the best reading of *W.D.* But as we have also explained in footnote 4 and its accompanying text above, *W.D.* is not entirely clear on the matter. It could also be read to say that third parties can pursue an independent action for custody if they can point to a specific analog in this court's precedents, arising in the same "factual context," under which they might ultimately be afforded relief (i.e., a grant of custody). 906 A.2d at 325 n.17. If that is the better way to read *W.D.*, then we would understand the savings clause in section 16-831.13 to preserve a limited right of third parties to proceed outside of the neglect apparatus so long as they can identify a specific precedent that permits them to gain custody over a child. Because there simply is no precedential analog under which Bowlding might be awarded custody of S.M. in any event, however, it is enough for us to say that Bowlding lacks standing under either potential reading of *W.D.*

Recall that *W.D.* is unclear in how it distinguished a group of eight cases that the third parties relied upon as establishing that our courts have inherent "authority to adjudicate custody disputes between biological parents and third parties as a matter of the court's basic equity jurisdiction." *Id.* We have posited that none of those eight cases is actually in tension with *W.D.*'s core holding that the neglect statutes displaced any inherent authority to hear such suits, but how *W.D.* meant to distinguish them is harder to decipher. Most importantly for our purposes, the cases cited by *W.D.* as countenancing our courts' authority to adjudicate third party custody disputes involved either parents seeking to regain custody of their children (and *W.D.* cast no doubt upon parents' abilities to do that) or third parties who were captured by the express provisions of the Safe and Stable Homes Act. That is, they involved (1) de facto parents seeking custody, (2) parents consenting to third party custody, (3) a third party who had recently been the child's primary caretaker for an extended period of time before seeking custody, or (4) a third party presently living with the child seeking custody. D.C. Code §§ 16-831.02(a)(1)(A)-(C), -831.03.[9]

_____

[9] Five of the cases fall within the third category above, *see* D.C. Code § 16-831.02(a)(1)(B), as they involved individuals like foster parents, step-parents, and grandparents who were living with the child both when they sought to retain custody and seemingly for years beforehand. *In re N.M.S.*, 347 A.2d at 925 (foster parents who raised child from "8 days old" to "9 1/2 years" old); *In re J.S.R.*, 374 A.2d at 865 (foster parents where the child knew "no other parents"); *Rutledge v. Harris*,

While we agree with Bowlding that the Council "did not replace existing custody law" via the Safe and Stable Homes Act, the Council did seek to exhaustively codify third party standing in section 16-831.02 of the Act. The savings clause was a mere recognition by the Council that it might have missed something in section 16-831.02 or in one of the Act's various other provisions, i.e., that it might have been unaware of some statute or prior precedent that extended rights to discrete third parties in some narrow circumstances outside of the particular

---

263 A.2d 256, 257 (D.C. 1970) (grandmother who lived with children at the time and had done so for about a decade prior); *Cooley v. Washington*, 136 A.2d 583, 584 (D.C. 1957) (stepmother who lived with the child for about a year before biological father's death prompted biological mother to seek son's return); *Holtsclaw v. Mercer*, 145 F.2d 388, 388 (D.C. Cir. 1944) (mother relinquished custody of infant to a couple and "three and a half years" later sought her return). Two of the cases involved biological parents successfully seeking to regain custody of children who were living with relatives at the time of the proceedings, so they were not initiated by third parties at all. *Sardo v. Villapiano*, 81 F.2d 255, 255-57 (D.C. Cir. 1935) ("[T]he boy's mother has prior claim to the custody of her son" over grandfather who lived with child for a year after father's death.); *Beall v. Bibb*, 19 App. D.C. 311, 312 (D.C. Cir. 1902) (mother awarded custody of twin girls over grandmother and aunt's objection). The last case involved a grandmother who apparently would not have satisfied any of the section 16-831.02 requirements—the child had lived with her off and on for a period just shy of four months—but it is inapposite because the court in that case did not hold that she could obtain any relief, and strongly suggested to the contrary. *Kirk v. Kirk*, 150 F.2d 589, 589-90 (D.C. Cir. 1945) ("the child's mother should be preferred," "the mother's actual custody of her child should not be disturbed" during pending proceedings, and the child's interests in "feel[ing] some degree of permanence" with his mother and "not tossed about like a ball" should be given "[g]reat weight"). Beyond those cases in *W.D.*'s footnote, Bowlding points to *Shelton v. Bradley* as support for his position, but that case also concerned a biological parent successfully seeking the return of their child, 526 A.2d 579, 579 (D.C. 1987), so it lends no support to any third party's ability to bring an independent custody action.

contours of section 16-831.02. While we do not foreclose the possibility that some such precedent exists in another context, so that perhaps section 16-831.02 does not truly exhaust the universe of third parties permitted to petition for custody, neither Bowlding nor we have identified any precedential analog that would permit him to obtain custody of S.M. on these facts. So even under the most generous plausible reading of our pre-Act holding in *W.D.*, Bowlding has no standing to proceed.

Bowlding's final argument is an appeal to what he asserts is a common law "maxim" that a killer should not "be allowed to benefit from his own wrong." He cites to a statutory prohibition on convicted murderers inheriting their victim's estates as support for that maxim. D.C. Code § 19-320; *cf. Hairston v. United States*, 264 A.3d 642, 646 (D.C. 2021) (discussing tangentially related "forfeiture by wrongdoing" exception to the Confrontation Clause and the rule against hearsay). That principle is of no help to Bowlding, however, because it is far too amorphous to establish our courts' common law or equitable jurisdiction to hear his case. The far more fitting generic principle is that custody disputes should generally be resolved in "the child's best interests," *see Pleasant v. Gibson*, 285 A.3d 1246, 1250 (D.C. 2022) (highlighting ubiquity of this principle in "child-welfare cases"), and we have already rejected the notion that standing can be predicated upon that generic principle. Specifically, in *B.J.* we agreed with the proposition that the "decision on whether a third party has standing to pursue custody of a child is not based on the

child's best interest," concluding that "[w]hether [a petitioner] had standing is [instead] a threshold question of law that must be resolved prior to, and independently of, the merits of the case." 266 A.3d at 215.

### III. Conclusion

For the foregoing reasons, Bowlding has no standing to maintain his suit for custody over S.M., and the trial court correctly dismissed it. We thus affirm.

*So ordered.*